Leopold MEINRATH, Plaintiff,

v.

The SINGER COMPANY, Defendant.

No. 79 Civ. 2442.

United States District Court,
S. D. New York.

Nov. 7, 1979.

Whitman & Ransom, New York City, for plaintiff; Paul M. Brown, Michael C. Pelletier, New York City, of counsel.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant, The Singer Co.; Judith S. Kaye, Richard A. Martin, John J. O'Connor, The Singer Co., New York City, of counsel.

OPINION

EDWARD WEINFELD, District Judge.

This case, which is before the Court on cross-motions for summary judgment,[1] involves a contract dispute. The plaintiff, Leopold Meinrath, is a Belgian entrepreneur engaged in the marketing and distribution of computers and related computer products throughout Europe, principally in the Benelux countries (Belgium, The Netherlands and Luxembourg) and in France. The defendant, The Singer Company, is a New Jersey corporation with its principal

---

1. Defendant moved under Rule 12 of the Federal Rules of Civil Procedure, or alternatively under Rule 56 for dismissal of the complaint. Since the parties have submitted opposing affidavits, the motion is deemed one under Rule 56. *See* Fed.R.Civ.P. 12(c); *Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); *Appalachian Power Co. v. American Institute of Certified Public Accountants,* 268 F.2d 845 (2d Cir.), *cert. denied,* 361 U.S. 887, 80 S.Ct. 158, 4 L.Ed.2d 121 (1959).

458

office in New York City, and is engaged in the manufacture and sale of a variety of products throughout the world. Although the instant dispute centers about a contract entered into by Meinrath and Singer on September 7, 1973, to place matters in focus, it is necessary to refer to some of the events that led to its signing.

Meinrath, who was engaged in the computer industry and the distribution of computer products, organized four "Unicard Companies" (hereafter collectively referred to as "Unicard"), one of which operated in each of the Benelux countries with the fourth in France.[2] On March 29, 1972, Unicard signed an agreement with Cogar, a domestic corporation, whereby Unicard became the exclusive distributor of Cogar's products, including a "mini computer" known as the "Cogar 4," in the four European countries in which Unicard operated.

Shortly thereafter, Singer decided to expand its operations to include the manufacture and sale in Europe of computers. In or about March 1973, Singer acquired a controlling stock interest in Cogar and in the process renamed "Cogar 4" as "Singer 1500." Prior to September 7, 1973, the date the parties hereto entered into their agreements, Meinrath was the "Chief Executive and Operating Officer" of Unicard and by that date was the sole stockholder of the four companies.

Beginning in about April 1973 and through to early September 1973, negotiations were carried on in New York City between Meinrath and Singer for its purchase of Unicard's exclusive distributorship agreement and assets related thereto. As is not unusual in negotiations of this type, each of the proposed contractees had differing views as to their preferences and the substance of their proposed respective rights and obligations that were to be reflected as their final understanding. Meinrath basically sought to sell the exclusive distributorship agreement for a flat sum of $1,000,000 cash, whereas Singer contemplated an arrangement whereby it would purchase the assets of Unicard, would employ Meinrath at a fixed annual salary and would pay him bonus compensation based on a specified formula related to sales of Cogar products. The plaintiff, as noted hereafter, alleges that defendant's employee proposal was in large measure motivated by alleged tax advantages.

As negotiations progressed a detailed letter of intent was signed by the parties on April 27, 1973. Eventually, their differing approaches were resolved and an agreement was entered into on September 7, 1973 which consists of (1) an Agreement of Purchase and Sale ("Purchase Agreement") between Meinrath, Mebraco and Unicard on the one hand and certain Singer subsidiary companies on the other hand, and (2) an Employment Agreement between Meinrath and Singer ("Employment Agreement").

Plaintiff alleges, and it is not disputed, that an integral part of the Purchase Agreement was the Employment Agreement—indeed, the contracts executed among the parties are by their terms deemed unitary. In broad outline, under the Purchase Agreement plaintiff's Unicard companies were to receive an aggregate purchase price of $280,000 for the Cogar exclusive distributorship agreement and related assets, and under the Employment Agreement Meinrath was to receive an annual salary of $40,000 on a monthly basis, and in addition, a commission ("bonus compensation") based upon orders booked for the sale or lease of Cogar products. The latter figure could range from a minimum of $220,000 to a maximum of $720,000. Thus under the two contracts the maximum amount that plaintiff and his companies could receive was $1,000,000 exclusive of the annual salary.

■ Paragraph 16 of the Singer statement under local Rule 9(g) alleges that

**2.** The four companies are Unicard Nederland B.V., a corporation organized under the laws of The Netherlands; Unicard Belgique (Luxembourg) S.A., a corporation organized under the laws of Belgium; Unicard France S.A., a corporation organized under the laws of France; and Mebraco, a corporation organized under the laws of Switzerland, which owned 100% of the shares of the foregoing three companies.

plaintiff has received approximately $700,000 under the Purchase and Employment Agreements and plaintiff does not dispute the essence of this allegation in his response. In his first count, based upon the foregoing agreement, plaintiff alleges he was entitled to receive a bonus compensation in the maximum aggregate of $720,000 and that Singer breached the Purchase Agreement and Employment Agreement by failure to pay plaintiff a balance of at least $300,000. There are other allegations under this first count which we shall presently consider, but it is clear that each of the parties agrees that the amount paid to plaintiff under the Purchase and Employment Agreements is approximately $700,000. They differ in that plaintiff asserts a balance is due him of $300,000 which the defendant denies contending that, according to its records, the balance has been fully satisfied. To support this position, Singer offers computations made by its accountants which purportedly reflect that all compensation and commissions to plaintiff have been paid in full. Plaintiff, on the other hand, contends that the computations made by Singer are erroneous and that they contain many discrepancies and inaccuracies. This contention finds support in an internal memorandum and letters prepared by a Singer representative, which indicate that even Singer's employees disagreed over the proper method by which the calculation should be made. Obviously, this presents a disputed issue of fact which requires denial of each party's motion for summary judgment under Count I.

Plaintiff seeks, under the first count, in addition to the $300,000 allegedly due under the Employment Agreement, damages in the sum of $500,000 upon a contention that defendant's non-payment of the balance due deprived him of working capital which he planned to use in connection with Unicard's additional business operations that were unrelated to the exclusive distributorship agreements, of which Singer had actual or constructive knowledge. While defendant disputes, even assuming a breach of the agreement, that this is a proper item of damage, the underlying facts upon which this claim is based present an issue of fact which again cannot be disposed of on this motion for summary judgment.[3]

Despite his reliance upon the agreements to sustain his Count I claim for a balance due thereunder and for additional damages, plaintiff alleges under Count II that he and his Unicard companies were induced to enter into the agreements by fraudulent representations made during the course of negotiations, to wit, that (1) the purchase price to be paid to him and his Unicard companies for the sale of the exclusive distributorship agreement with Cogar and related assets would be $1,000,000[4]; (2) the money would be paid reasonably promptly after the execution of the final purchase and employment agreements; (3) the reason the purchase price of $1,000,000 would not be specifically reflected in the aforesaid agreements was because Singer would obtain tax advantages by paying the bulk of the purchase price to acquire the exclusive distributorship in the form of an employee's bonus arrangement; and (4) if the purchase agreement contained a stated purchase price of $1,000,000, execution of the agreement by the Board of Directors might be delayed for a considerable period of time. In effect, however stated, Meinrath now claims that he and his companies were to receive $1,000,000 for the sale of the exclusive distributorship agreement which was his original proposal to Singer. If these

---

3. *See, e. g., Spang Indus., Inc., Ft. Pitt Bridge Div. v. Aetna Cas. & Sur. Co.,* 512 F.2d 365, 368–71 (2d Cir. 1975); *Perma Research & Dev. Co. v. Singer Co.,* 402 F.Supp. 881, 898–99 (S.D.N.Y.1975); aff'd, 542 F.2d 111 (2d Cir. 1976); *For Children Inc. v. Graphics Int'l, Inc.,* 352 F.Supp. 1280, 1284 (S.D.N.Y.1972).

4. The defendant brands this contention as bordering on the absurd. It alleges that the physical assets of Unicard never approached $1,000,000 in value—that the real value of the arrangement with plaintiff was the expectation of future sales and machines placed on lease and that the agreement was drafted accordingly. However, this Court does not pass on the verity of this assertion or of plaintiff's other numerous charges which are denied by defendant.

allegations of alleged fraudulent conduct are accepted as the basis of his claim of $800,000 damages, they stand the contracts entered into after extended negotiations over a six-month period on their head and reduce them to a mere scrap of paper.

Unless the summary judgment rule has become a dead letter [5] the defendant's motion pursuant thereto must be granted for a number of reasons. It taxes credulity beyond belief that plaintiff and defendant's representatives, all capable, knowledgeable and experienced businessmen, after months and months of intensive negotiations and bargaining finally signed a document of over 200 pages that includes an explicit merger clause "cancel[ing] and supersed[ing] all prior documents between the parties" that did not reflect their true arrangement. First, Meinrath's claim is effectively repelled by documentary evidence including his own writings, for example, the letter of intent signed four months antecedent to the ultimate definite agreement. Indeed, an affidavit by a former Singer officer who played a role in the negotiations and submitted by plaintiff in support of his motion states, "Meinrath reluctantly agreed in principle to become a Singer employee

and to permit an allocation of the $1,000,000 purchase price." Unless we have reached the point in commercial life where, as in *Alice in Wonderland*, words to not mean what they say, plaintiff's claim must fail. But even if Meinrath's bold assertion that the parties covertly disavowed the clear and precise language of the written contract is sufficient to raise an issue of fact [6] nonetheless, legal barriers bar his claim.

One of the oldest and most settled principles of New York law is that a party. may not offer proof of prior oral statements to alter or refute the clear meaning of unambiguous terms of written, integrated contracts to which assent has voluntarily been given.[7] The plaintiff's attempt to avoid the strictures of the parol evidence rule by alleging fraudulent inducement is unavailing. Although proof of fraud can vitiate an agreement,[8] such proof may only be offered to show "the intention of the parties that the *entire contract* was to be a nullity, not as here that only certain provisions of the agreement were to be enforced." [9] Here the plaintiff is not claiming that no agreement existed between himself and Singer; he is not seeking rescission, but

5. *Cf. Applegate v. Top Associates Inc.*, 300 F.Supp. 51, 53 (S.D.N.Y.1969), *aff'd*, 425 F.2d 92 (2d Cir. 1970); *Morgan v. Sylvester*, 125 F.Supp. 380 (S.D.N.Y.1954), *aff'd*, 220 F.2d 758 (2d Cir. 1955).

6. The Court is not unmindful that summary judgment is a " 'drastic device,' " *Jaroslawicz v. Seedman*, 528 F.2d 727, 731 (2d Cir. 1975) (quoting *Heyman v. Commerce & Industry Insur. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)), and that "[t]he responsibility of the district judge on a motion for summary judgment is merely to determine whether there are issues to be tried, rather than to try the issues himself via affidavits." *Jaroslawicz, supra* at 731. *See also S. E. C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).

7. *See, e. g., Newburger v. American Surety Co.*, 242 N.Y. 134, 142, 151 N.E. 155 (1926); *Thomas v. Scutt*, 127 N.Y. 133, 137, 27 N.E. 961, 962 (1891) ("It is a general rule that evidence of what was said between the parties to a valid instrument in writing, either prior to or at the time of its execution, cannot be received to contradict or vary its terms.") *See also Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447,

451 (2d Cir. 1977) (citing cases); *Hoh v. Pepsico, Inc.*, 491 F.2d 556, 558 n.2 (2d Cir. 1974); *Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1048–49 (5th Cir. 1971) (construing New York law). *Cf. Lipsky v. Commonwealth United*, 551 F.2d 887, 896 (2d Cir. 1976) (extrinsic evidence may be received to interpret the ambiguous terms of a contract).

8. *See, e. g., Millerton Agway Coop v. Briarcliff Farms*, 17 N.Y.2d 57, 268 N.Y.S.2d 18, 215 N.E.2d 341 (1966) (party induced to enter into contract by fraudulent promise with respect to some other item beyond the scope of the contract has a cause of action); *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 717–18, 143 N.E.2d 906, 909 (1957) (Fuld, J.) (in an action to rescind a contract, allegation that one party made a contractual promise while harboring undisclosed intentions not to perform is sufficient to state a cause of action).

9. *Bersani v. General Accident Fire & Life Assur. Corp.*, 36 N.Y.2d 457, 369 N.Y.S.2d 108, 112, 330 N.E.2d 68, 71 (1975) (emphasis supplied).

enforcement of the contract,[10] albeit upon terms of compensation markedly different from those in the writing. Indeed, in a prior lawsuit brought in Belgium, plaintiff successfully enforced that portion of the contract governing annual salary.[11] This is not a case in which a party seeks to introduce parol evidence to clarify ambiguities,[12] to supply an essential but missing term,[13] to establish that a condition precedent to the formation of the contract has not been fulfilled,[14] or to rectify a unilateral mistake in his understanding of the agreement.[15] Here the plaintiff seeks materially to alter, by introducing prior parol evidence, a single unambiguously expressed item—the terms of compensation—in a comprehensive contract that includes an explicit merger clause. To allow him to do so would be to eviscerate the parol evidence rule, "whose very purpose and essence . . . is to avoid fraud that might be perpetrated if testimony as to subjective intent could be substituted for the plain meaning" of the agreement.[16] The defendant's motion for summary judgment dismissing Count II of the Complaint is granted.

Plaintiff's claim for punitive damages must also be rejected, for it is elementary that such damages may not be awarded in an action for breach of contract.[17]

In short, the Court grants summary judgment to the defendant with respect to Counts II and III of the Complaint.

So ordered.

---

10. *Cf. Barash v. Pennsylvania Terminal Real Estate Corp.,* 26 N.Y.2d 77, 86–87, 308 N.Y.S.2d 649, 656, 256 N.E.2d 707, 714 (1970).

11. Judgment of September 26, 1977, Tribunal du Travail de Bruxelles, No. 77/12932.

12. *See, e. g., Lipsky v. Commonwealth United,* 551 F.2d 887, 896 (2d Cir. 1976).

13. *See Lashway v. Sorrell,* 51 A.D.2d 97, 380 N.Y.S.2d 334 (3d Dep't 1976).

14. *See, e. g., Long Island Trust Co. v. International Institute for Packaging Education, Ltd.,* 38 N.Y.2d 493, 381 N.Y.S.2d 445, 344 N.E.2d 377 (1976).

15. *Barash v. Pennsylvania Terminal Real Estate Corp.,* 26 N.Y.2d 77, 86–87, 308 N.Y.S.2d 649, 656, 256 N.E.2d 707 (1970).

16. *Eskimo Pie Corp. v. Whitelawn Dairies,* 284 F.Supp. 987, 993 (S.D.N.Y.1968).

17. *See, e. g., Garrity v. Lyle Stuart, Inc.,* 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 833, 353 N.E.2d 793, 795 (1976); *M. S. R. Associates, Ltd. v. Consolidated Mut. Ins. Co.,* 58 A.D.2d 858, 396 N.Y.S.2d 684 (2d Dep't 1977). *See also* Restatement (Second) of Contracts § 369 (Tentative Draft No. 14, March 1, 1979) ("Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.")